# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **DUSTI PRESTON,** | : | |
| | : | |
| Plaintiff, | : | Case No. 12-cv-01252 (RNC) |
| | : | |
| **vs.** | : | |
| | : | |
| **BRISTOL HOSPITAL,** | : | |
| | : | |
| Defendant. | : | **MAY 5, 2014** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THE PLAINTIFF

By   /s/  Vincent F. Sabatini
Vincent F. Sabatini, Esquire    CT 06211
Sabatini and Associates, LLC
One Market Square
Newington, CT  06111
Tel. No.:  860-667-0839
Fax No.:  860-667-0867
e-mail:  vsabatini@sabatinilaw.com

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………….…….   iii

I. INTRODUCTION……………………………………………………..   1

II. STATEMENT OF RELEVANT FACTS………………………………   2

III. LAW………………………………………………………………...   9

    A. Legal Standard……...……………………………………   9

       1. Summary Judgment……………………………………..   9

       2. Discrimination Standard……………………….............   10

IV. ARGUMENT…………………………………………………………   14

    A.    Plaintiff Can Establish Prima Facie Case of Disability
        Discrimination, Gender Discrimination, Marital Status
        Discrimination and/or Retaliation…………………………..   14

       1. Disability Discrimination under the ADA & CFEPA ……   14
         a. Plaintiff Had a Disability as Defined by the ADA
          as Amended……………………………………..   14
         b. Plaintiff Had a Disability as Defined by CFEPA….   17
         c. Evidence Supports An Inference of Discrimination..   18

       2. Gender Discrimination……………………………….…   20
       3. Marital Status Discrimination……………………………   25
       4. Retaliation………………………………………………   33

    B.    Defendant's Proffered Reason for the Adverse Employment
        Actions Were Pretext…………………………………………   35

V.    CONCLUSION……………………………………………………   40

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)……………………………………………………    10

Back v. Hastings On Hudson Union Free School Dist.,
365 F.3d 107 (2d Cir. 2004)…………………………………………    13, 20,
21, 35

Beason v. United Technologies Corp.,
337 F.3d 271 (2d Cir.2003)…………………………………………..    17

Blanco v. Brogan,
620 F. Supp. 2d 546 (S.D.N.Y. 2009)………………………………    33

Bolmer v. Oliveira,
594 F.3d 134 (2d Cir. 2010)…………………………………………    13

Brittell v. Dep't of Corr.,
247 Conn. 148, (1998)………………………………………………..    25

Butts v. NY City Dept of House Pres. & Dev.,
307 Fed. Appx 596 (2009)……………………………………………    13

Byra-Grzegorczyk v. Bristol-Myers Squibb Co.,
572 F. Supp. 2d 233 (D. Conn. 2008)………………………………    33

Carlton v. Mystic Transp., Inc.,
202 F.3d 129 (2d Cir. 2000)…………………………………………    14

Celotex Corp. v. Catreet,
477 U.S. 317 (1986)…………………………………………………..    9

Chadwick v. WellPoint Inc.,
561 F.3d 38 (1st Cir. 2009)…………………………………………    20, 21,
22

Connecticut v. Teal,
457 U.S. 440, (1982)…………………………………………………    30

D'Amico v. City of New York,
132 F.3d 145 (2d.Cir.1998)…………………………………………    9

Dartmouth Review v. Dartmouth College,
889 F.2d 13, (1st Cir. 1989)…………………………………………    31

Davis v. State Univ. of New York,
802 F.2d 638 (2d Cir.1986)............................................................ 33

DeCintio v. Westchester County Med. Center,
821 F.2d 111 (2d Cir.1987)............................................................ 34

Defranco v. Ametek Ameron, LLC,
2013 U.S. App. LEXIS 46 08 (2d Cir. 2013)........................................ 27

Dzubaty v. Milford Bd. of Educ.,
2007 WL 2570413 (Conn. Super. Ct. Aug. 20, 2007)................................... 17

Feingold v. New York,
366 F.3d 138 (2d Cir. 2004)............................................................ 11, 25

Forkkio v. Powell,
306 F.3d 1127 (D.C. Cir. 2002)........................................................ 23

Francis v. City of Meriden,
129 F.3d 281 (2d Cir. 1997)............................................................ 17

Galabya v. New York City Boar of Educ.,
202 F.3d. 636 (2d Cir. 2000)........................................................... 23

Gallo v. Prudential Residential Services, Ltd. P'ship,
22 F.3d 1219 (2d Cir. 1994)........................................................... 12, 14

Gallo v. Second Taxing District of City Of Norwalk Operating
Under The Name Of South Norwalk Electric And Water,
507 F.Supp.2d 164 (D.Conn.2007)...................................................... 12

Giordano v. City of New York,
274 F.3d 740 (2d Cir. 2001)........................................................... 11, 15

Golden Hill Paugussett Tribe of Indians v. Rell,
463 F.Supp.2d 192 (D.Conn. 2006)..................................................... 24

Gross v. FBL Financial Services, Inc.,
129 S.Ct. 2343 (2009)................................................................. 13

Guglietta v. Meredith Corporation,
301 F.Supp.2d 209 (D. Conn. 2011).................................................... 27

Houhmann v. GTECH Corp.,
910 F.Supp.2d 400 (D.Conn. 2012).................................................... 23, 24

*Lillis v. Apria Healthcare Inc.,*
2013 WL 1561491 (S.D. Cal 2013)……………………………………… 24

*Matthews v. Connecticut Light and Power Co.,*
2006 WL 2506957 (D.Conn. 2006)……………………………………… 31, 38

*Meiri v. Dacon,*
759 F.2d 989 (2d Cir.1985)……………………………………………… 12

*McBride v. BIC Consumer Products Mfg. Co., Inc.,*
583 F.3d 92, (2d Cir. 2009)……………………………………………… 19

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973)……………………………………………………… 10, 11,
14, 33

*McGuiness v. Lincoln Hall,*
263 F.3d 49 (2d Cir.2001)………………………………………………… 11

*Montana v. First Fed. Sav. & Loan Ass'n of Rochester,*
869 F.2d 100 (2d Cir. 1989)……………………………………………… 14

*Parker v. Columbia Pictures Industries,*
204 F.3d 326 (2d Cir. 2000)…………………………………………….... 13

*Perry v. NYSARC, Inc.,*
424 F. App'x 23 (2d Cir. 2011)…………………………………………… 13

*Phillips v. Martin Marietta Corp.,*
400 U.S. 542 (1971)……………………………………………………… 20

*Quaratino v. Tiffany & Co.,*
71 F.3d 58 (2d Cir. 1995)………………………………………………… 11, 12

*Raytheon Co. v. Hernandez,*
540 U.S. 44 (2003)……………………………………………………… 10

*Reeves v. Sansderson Plumbing Prods., Inc.,*
530 U.S. 133, 143 (2000)………………………………………………… 12, 13,
36

*Santiago-Ramos v. Centennial P.R. Wire-less Corp.,*
217 F.3d 46 (1st Cir. 2000)……………………………………………… 22

*Shain v. Ctr. for Jewish History, Inc.,*
418 F. Supp. 2d 360 (S.D.N.Y. 2005)…………………………………….. 14

State v. Beavers,
290 Conn. 386 (2009)……………………………………………………   40

Stern v. Trustees of Columbia University,
131 F.3d 305 (2d Cir. 1997)……………………………………………   31, 38

St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502 (1993)…………………………………………………...   13

Stratton v. Dept. for the Aging for the City of New York,
132 F.3d 869 (2d Cir.1997)……………………………………………   12, 13

Summers v. Altarum,
740 F.3d 325 (4th Cir. 2014)…………………………………………...   16

Taylor v. Local 32E Serv. Employees Int'l, Union,
286 F. Supp. 2d 246 (S.D.N.Y. 2003)…………………………………   11

Taylor v. Local 32E Serv. Employees Int'l Union,
118 F. App'x 526 (2d Cir. 2004)………………………………………   11

Terry v. Ashcroft,
336 F.3d 128 (2d Cir. 2003)…………………………………………...   19, 33,
                                                                34

Texas Dept. of Cmty. Affairs v. Burdine,
450 U.S. 248 (1981)……………………………………………………   11, 12

Tingley-Kelley v. Trustees of University of Pennsylvania,
677 F.Supp.2d 764 (E.D.Pa. 2010)…………………………………......   20, 21

Trustees of Health and Hosp. of City of Boston, Inc. v.  Mass. Comm'n Against
Discrimination, 449 Mass. 675, (2007)…………………………………   30

Univ. of Tenn. v. Elliott,
478 U.S. 788 (1986)……………………………………………………   24

Weinstock v. Columbia Univ.,
224 F.3d 33(2d Cir.2000)………………………………………………   10

Weixel v. Bd. Of Educ. Of the City of N.Y.,
287 F.3d 138 (2d Cir. 2002)……………………………………………   33

Zubrow v. Solvay Pharms, Inc.,

207 Fed.Appx. 37 (2d Cir.2006)…………………………………………………  10

## FEDERAL STATUTES

29 C.F.R. § 1630.2(j0(1)(ix)………………………………………………..  16

42 U.S.C. § 12101……..…………………………………………………  15

42 U.S.C. § 12102………………………………………………………  15, 16

## STATE STATUTES

Con. Gen. Stat. § 46a-51(15)…………………………………………………  18

Con. Gen .Stat. § 46a-60(a)(1) et seq

Con. Gen .Stat. § 46a-60(a)(2)…………………………………………………  25

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DUSTI PRESTON, | : | |
| | : | |
| Plaintiff, | : | Case No. 12-cv-01252 (RNC) |
| | : | |
| vs. | : | |
| | : | |
| BRISTOL HOSPITAL, | : | |
| | : | |
| Defendant. | : | MAY 5, 2014 |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.     <u>INTRODUCTION</u>

Plaintiff submits her Memorandum of Law in Support of her Objection to

Defendant's Motion for Summary Judgment.  As set forth below, genuine issues of

material fact exist and the Defendant is not entitled to judgment as a matter of law.

Specifically, Plaintiff objects on the grounds that the Defendant discriminated against the

Plaintiff on the basis of her gender, marital status, and disability. In addition, Plaintiff

objects on the grounds that the Defendant retaliated against the Plaintiff for making

complaints of discrimination. Filed with and supporting Plaintiff's Objection is Plaintiff's

Local Rule 56(a)(2) Statement, Affidavits of Megan L Piltz, Esq., and Dusti Preston,

deposition testimony and exhibits.

In brief, the plaintiff, Dusti Preston ("plaintiff" or "Preston") was employed by the Defendant, Bristol Hospital ("The Hospital" or "defendant") as CAT Scan technician, working the second shift since May of 2002. (56(a) Statement ¶ 1).   On October 14, 2011, the plaintiff was terminated. (Exhibit 1 p. 113-114).

On August 28, 2012, plaintiff brought a complaint against The Hospital, which was amended on October 29, 2012. The complaint alleges that Defendant's termination of Plaintiff's employment was retaliatory and discriminatory in violation of Title VII of the Civil Rights Act of 1964 (Title VII), the Connecticut Fair Employment Practices Act, Con. Gen. Stat. 46a-60(a)(1) *et seq*. (CFEPA) and the Americans With Disabilities Act of 1990 as Amended (ADAA). The Defendant have moved for summary judgment.  The Plaintiff objects to summary judgment on the grounds that genuine issues of material fact exist.

## II.   STATEMENT OF RELEVANT FACTS

Plaintiff began her employment with the Defendant as a CT Scan technician in May of 2002. (56(a) Statement ¶ 1). Throughout the tenure of her employment Plaintiff worked the second shift. (56(a) Statement ¶ 1). When hired in May of 2002 Plaintiff was married. (Exhibit 16). In 2002, Plaintiff had her daughter Morghan. (Exhibit 15 ¶ 4). In 2005, Plaintiff was divorced and remained unmarried throughout the remainder of her employment with Bristol Hospital. (Exhibit 1 p. 19, Exhibit 15 ¶ 5).

During Plaintiff's employment she reported to Heidi McLam the lead tech. In 2011 Al Lampety became the Operations Manager whom Heidi reported to and Al Lamperty

reported to Marie Marciano, the Director of Diagnostic Services. (Exhibit 1 p. 43-44, Exhibit 3 p. 6-7).

In 2010 MediTech, a software program, was obtained by the Hospital and a MediTech team was put together to train the hospital staff on how to use MediTech. (Exhibit 1 p. 61-62). Plaintiff informed Heidi McLam, Shana and Marie Marciano that she was interested in being a part of the MediTech team. (Exhibit 1 p. 66, Exhibit 15 ¶6). Marie Marciano and Shana were the decision makers for who would be chosen to be part of the MediTech team. (Exhibit 1 p. 143). Plaintiff was not chosen to be a part of the MediTech team, instead Donna Santopietro, who had less seniority than Plaintiff, was chosen from Plaintiff's department. (Exhibit 1 p. 67, Exhibit 15 ¶ 8). Donna Santopietro was married. (Exhibit 15 ¶ 8). Plaintiff asked Marie Marciano why she had not been chosen to be on the MediTech team and Marie responded; "well isn't it difficult for you, being the only one at home?" Plaintiff responded "so it makes it –because someone with less seniority would get it, just because she has a husband at home?" and Marie responded "Well, you have to admit it makes it a lot easier." (Exhibit 1 p. 73-74, Exhibit 15 ¶ 7). Shana also told Plaintiff "I know you're a single mom. I thought that might make it harder for you." (Exhibit 1 p. 142). No one addressed Plaintiff's interest of being a part of the team with her prior to making the decision that she was unable to do so because of her presumed childcare issues and unmarried status. (Exhibit 1 p. 76, Exhibit 15 ¶ 10). Plaintiff

also made a complaint to Heidi that someone with less seniority was chosen over Plaintiff. (Exhibit 1 p. 78).

In July of 2011 Plaintiff was diagnosed with a stress fracture in her left foot and the Defendant was made aware of this since Plaintiff treated with Medworks, which is a part of the Defendant hospital. (Exhibit 1 p. 81, Exhibit 17). On July 13, 2011 Plaintiff was put on light duty with restrictions of "no transporting patients" (Exhibit 1 p.81-83, Exhibit 17, Exhibit 6). Plaintiff requested help with transporting patients. Al Lampety was unwilling to give Plaintiff "transport". He gave Plaintiff grief about needing transport help while Plaintiff was disabled to the point where Plaintiff was afraid to fill out an incident report or use her earned time off for her injury because she thought it would affect her job negatively. (Exhibit 1 p. 84, 90-91, 94, 139-141, 194-196, Exhibit 15 ¶ 15). In addition, when Plaintiff would request transportation help Al Lampety would often comment, "this is becoming a bad habit" and "Don't make a habit out of this." (Exhibit 1 p. 84, 140-141, Exhibit 15 ¶ 15). Sometimes Plaintiff did not have transportation help. (Exhibit 1 p. 84, Exhibit 15 ¶ 16). While Plaintiff was on light duty she slipped on an IV Cap and was required to fill out an incident report. (Exhibit 1 p. 93-94). In response to Plaintiff's slip Al Lampety commented "can't you stay off the floor." (Exhibit 1 p. 94). On September 21, 2011 Plaintiff was cleared to return to full duty with no restrictions. (Exhibit 1 p. 92-93, Exhibit 7, Exhibit 15 ¶ 14). Plaintiff was on light duty for a total of ten weeks. (Exhibit 6, 7, 15 ¶ 14).

Throughout the tenure of her employment with the Defendant, Plaintiff had no
disciplinary problems prior to October of 2011. (Exhibit 2 p. 42, 53-54, Exhibit 3 p. 41,
Exhibit 15 ¶ 2).

As a CT Scan technician Plaintiff was required to work some weekends. (Exhibit 1
p. 33). In September of 2011 due to a co-worker leaving there were additional shifts that
needed to be filled. (Exhibit 1 p. 97-98, Exhibit 3 P. 17-18). On September 15, 2011 Heidi
McLam sent an email to Plaintiff and the other CT Techs stating that the shifts would be
available for volunteers but if no one volunteered they would be assigned on a rotating
basis. (Exhibit 5). Plaintiff informed Heidi McLam and Al Lampety as soon as the
schedule was posted, September 30, 2011, that she would not be able to work October 15,
2011 because no one was available to care for her daughter. (Exhibit 1 p. 110,111, 112
Exhibit 15 ¶ 18, Exhibit 22, Exhibit 23).  In point of fact Plaintiff wrote on the sign-up
sheet that she had her daughter Morghan and therefore needed coverage. (Exhibit 1 p. 110,
Exhibit 8, Exhibit 15 ¶ 18, Exhibit 24).The Defendant admitted that it had actual
knowledge of this. See (Exhibit 24, The Connecticut Unemployment Appeals Decision
wherein Heidi McLam indicated that she had seen Plaintiff's message). Plaintiff asked
other co-workers if they could cover her October 15, 2011 shift, including Jayne. (Exhibit
1 p. 113). Plaintiff had worked the weekend prior as part of her normal schedule.  The
October 15th shift was a shift assigned to Plaintiff due to the co-worker leaving the
department. (Exhibit 15 ¶ 33, Exhibit 2 p. 139). Plaintiff was first told by Al Lampety that

Donna was going to cover the shift on October 15, 2011. (Exhibit 1 p. 110, 112, Exhibit 15 ¶ 19). Al Lampety signed off that it was ok for Plaintiff to switch and pick up a different date in November since she could not work October 15, 2011. (Exhibit 1 p. 134-135, Exhibit 14, Exhibit 15 ¶ 21). However at the last minute, Plaintiff was told on October 13, 2011 around 3:30-4:00 p.m. that Donna could no longer work the shift on the 15th and therefore, Plaintiff had to work it or find coverage in less than 2 days. (Exhibit 1 p. 112, 192-193, Exhibit 15 ¶ 22). Al Lamptey knew prior to October 13, 2011 that plaintiff could not work the October 15, 2011 shift because plaintiff told him that her Daughter was under her care that weekend and she had no one else at home to help out. (Exhibit 15 ¶ 23, Exhibit 23). Plaintiff offered to try and work part of the shift but was told by Heidi that was not good enough, that she needed to work the whole shift. (Exhibit 1 p. 119, 124, Exhibit 15 ¶ 25, 29).  Other individuals had been allowed to work partial shifts in the past. (Exhibit 15 ¶ 26).

On October 14, 2011 Plaintiff was called into HR to meet with Jeanine Reckdenwald and Al Lamptey. (Exhibit 1 p. 123, Exhibit 15 ¶ 27). In the October 14, 2011 meeting Plaintiff informed Jeanine Reckdenwald and Al Lamptey that she had offered to work part of the shift but Heidi McLam said that "was not good enough". (Exhibit 1 p. 124, Exhibit 15 ¶ 29). In the October 14, 2011 meeting Plaintiff was asked "Isn't there anybody that can help you? Don't you have somebody else at home." (Exhibit 1 p. 124, Exhibit 15 ¶ 30).  Plaintiff responded that no, she is a single parent, that her baby sitter had

to go to Vermont and that she had no one to care for her child.; Al Lampety's reply was

"Everybody has a story." (Exhibit 1 p. 123,126, Exhibit 15 ¶ 31, Exhibit 22, Exhibit 23).

During the meeting, no one told Plaintiff that part of the October 15, 2011 shift was

covered and that she only needed to cover a few hours. (Exhibit 1 p. 125, 148, Exhibit 15¶

32). On October 14, 2011, the day after Plaintiff was told the shift was once again her

responsibility, Plaintiff was fired for being unable to work the shift. (Exhibit 15 ¶ 34).

Reckenwald made the decision to terminate plaintiff based on her investigation which

consisted of Al Lampety's version of what happened with the October 15, 2011 shift and

input from Marie and Heidi. (Exhibit 2 p. 46-47, 77, 125). Al Lampety and Heidi McLam

had told Reckenwald that Plaintiff never volunteered for open shifts. (Exhibit 2 p. 125).

Donna (who is married and the same person chosen for the MediTech team as identified

herein) was not disciplined for backing out of the October 15, 2011 shift last minute

without getting coverage and is still employed by the Defendant. (Exhibit 2 p. 150-151).

The Plaintiff filed for Unemployment Benefits. The Defendant objected to the

filing, claiming that the Plaintiff committed "wilful misconduct" and therefore was not

entitled to benefits. The Unemployment Agency actually held hearings wherein

representatives of the Defendant testified. The Agency made findings of fact. On February

2, 2012, the unemployment appeals referee issued a decision providing the following

findings of fact based on the testimony of the Plaintiff, Al Lamptey and Jeanine

Reckdenwald. (See Exhibit 24. The findings revealed that:  "On September 30, 2011

Plaintiff wrote "I have Morghan" on the sign up sheet and Heidi McLam indicated she had

seen Plaintiff's note. (Exhibit 24 ¶ 3). On October 12, 2011, Heidi McLam told Plaintiff

she would have to work the October 15, 2011 shift because no one volunteered. (Exhibit

24 ¶ 4). On October 13, 2011, Plaintiff spoke with Al Lamptey and Jeanine Reckdenwald

about being unable to work the October 15, 2011 shift. (Exhibit 24 ¶ 5). Plaintiff signed up

for a different weekend shift for November 22, 2011. (Exhibit 24 ¶ 6). On October 14,

2011, after Plaintiff informed Reckdenwald she had made all reasonable attempts to find

childcare without avail Reckdenwald terminated the Plaintiff. (Exhibit 24 ¶ 11). The

unemployment appeals referee further concluded that there was no willful misconduct by

Plaintiff." (Exhibit 24 p. 4).

Plaintiff did in fact volunteer for two open shifts in November, the 3rd and the 22nd.

(Exhibit 1 p. 109, Exhibit 8, Exhibit 14, Exhibit 24). No other regularly employed techs are

shown on the sign up sheet for October or November. (Exhibit 8). The only other names on

the sign up sheet for October or November, besides the Plaintiff's, are Diane, James and

Sara who are all per diems. (Exhibit 3 p. 28-29, 78, 80-82, Exhibit 8).

Plaintiff's employee evaluations reflect she was considered a "team player" and

often helped get the "Schedule covered when vacations or emergencies arise." (Exhibit

10). Plaintiff "does help cover hours when needed," "Dusti takes extra shifts when she is

able, to cover vacations and sick calls and she helps out when she's able with working

extra shifts to help cover illness or vacation," "She helps out when her schedule allows," "
(Exhibit 11, 12, 13).

      Immediately after being terminated from Bristol Hospital plaintiff began her search
for a new job. (Exhibit 1 p. 20). Plaintiff searched on websites such as "indeed.com,
careerbuilding.com," through the labor department and also took classes "on how to do
your résumés and job searches." (Exhibit 1 p. 21). Plaintiff, applied to more than thirty
jobs and had at least three interviews. (Exhibit 1 p. 21). Plaintiff had to leave the State of
Connecticut in order to find work and finally found new employment with Tower
Radiology in Maryland in April of 2013 and also worked a per diem job with Civista
Hospital in Maryland. (Exhibit 1 p. 23-24).

## III.    <u>LAW</u>

### A.    Legal Standard

#### 1.    Summary Judgment

      A motion for summary judgment should be granted "where there exists no genuine
issue of material fact and, based on the undisputed facts, the moving party is entitled to
judgment as a matter of law." <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149
(2d.Cir.1998).  It is the moving party's burden to establish that no genuine issue of
material fact exists and judgment should enter as a matter of law. <u>Celotex Corp. v. Catreet</u>,
477 U.S. 317, 322-23 (1986). To defeat a motion for summary judgment, the non-moving
party must present evidence that could be sufficient to return a jury verdict in the non-

moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In

reviewing the record, the evidence of the party opposing summary judgment is "to be

believed, and all justifiable inferences are to be drawn in [that party's] favor." Id. at 255.

Summary judgment shall be denied if a dispute is shown "over facts that might affect the

outcome of the suit." Id. at 248.  Therefore, the plaintiff must demonstrate a genuine issue

of material fact as to whether defendant's proffered reason for termination was pretext for

discrimination or whether the plaintiff's gender, marital status, disability and/or retaliation

played a motivating factor in defendant's decision to termination the plaintiff.

### 2.      Discrimination Standard

The plaintiff claims discrimination on the basis of disability in violation of ADA

and CFEPA, as well as gender and marital status discrimination in violation of the Title

VII of the Civil Rights Act and CFEPA.  In discrimination claims under the ADA, Title

VII, and CFEPA, the three step burden shifting framework set forth in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973) is employed.  Raytheon Co. v.

Hernandez, 540 U.S. 44 (2003) (determining that the burden shifting framework applied in

Title VII cases also applies to ADA claims); Zubrow v. Solvay Pharms, Inc., 207

Fed.Appx. 37, 38 (2d Cir.2006) (*citing* Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d

Cir.2000)) (determining that claims of discrimination under CFEPA are governed by the

*McDonnell Douglas* three-part burden shifting framework.).   As such, the claims herein

will be analyzed under the burden-shifting federal standard of McDonnell Douglas.

First, claimant must demonstrate a prima facie case.  Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995).  To allege a prima facie case of discrimination, as originally required in McDonnell Douglas, plaintiff must show: "1) that she belonged to a protected class; 2) that she was qualified for the position she held; 3) that she suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."[1]  Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (internal citations omitted).  The plaintiff's burden in establishing this prima facie case in *de minimis* and direct evidence is not required. Taylor v. Local 32E Serv. Employees Int'l, Union, 286 F. Supp. 2d 246, 252 (S.D.N.Y. 2003) aff'd sub nom. Taylor v. Local 32E Serv. Employees Int'l Union, 118 F. App'x 526 (2d Cir. 2004); McGuiness v. Lincoln Hall, 263 F.3d 49, 52 (2d Cir.2001); Quaratino, 71 F.3d at 64; see also Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous.")  All of the facts must be considered in the light most favorable to the plaintiff and "a plaintiff may prevail if [she] submits enough believable evidence for a jury to find that an adverse employment decision resulted because of discrimination."

---

[1] Specifically with regards to the ADA, the plaintiff must show: "(1) [the] employer is subject to the ADA; (2) [the plaintiff] was disabled within the meaning of the ADA; (3) [the plaintiff] was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [the plaintiff] suffered adverse employment action because of his disability."  Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001).

Quaratino, 71 F.3d at 64.  Establishment of the prima facie case in effect creates a

presumption that the employer unlawfully discriminated against the employee.  Burdine,

450 U.S. at 254; Gallo v. Second Taxing District of City Of Norwalk Operating Under The

Name Of South Norwalk Electric And Water, 507 F.Supp.2d 164, 172 (D.Conn.2007).

Once the plaintiff has satisfied her prima facie case for discrimination, the burden

shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the

adverse employment action at issue. Burdine, 450 U.S. at 254.  The purpose of this step is

"to force the defendant to give an explanation for its conduct, in order to prevent

employers from simply remaining silent while the plaintiff founders on the difficulty of

proving discriminatory intent." Stratton v. Dept. for the Aging for the City of New York,

132 F.3d 869, 879 (2d Cir.1997).  "The employer's legitimate, non-discriminatory reason

must be both 'clear and specific.'" Gallo, 507 F.Supp.2d at 172  (quoting in part Meiri v.

Dacon, 759 F.2d 989, 997 (2d Cir.1985)).

If the employer satisfies this burden of production, the burden shifts back to the

claimant to show that the employer's reason "was merely a pretext for discrimination."

Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

The plaintiff "may attempt to establish that he was a victim of intentional discrimination

by showing that the employer's proffered explanation is unworthy of credence." Reeves v.

Sansderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). "[A] reason cannot be proved

to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 533, 113 S. Ct. 2742, 2761 (1993). "[T]he plaintiff is not required to show that the employer's proffered reasons . . . played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.'" Back v. Hastings On Hudson Union Free School Dist., 365 F.3d 107, 123 (2d Cir. 2004).[2]

The "ultimate issue" in an employment discrimination case is "whether the plaintiff has demonstrated that the adverse employment action was motivated at least in part by an 'impermissible reason, i.e. a discriminatory reason.'" Stratton, 132 F.3d at 879.  The plaintiff can satisfy this burden by demonstrating that her disability, marital status and/or gender was a motivating or substantial factor in the adverse employment actions she faced. Butts v. NY City Dept of House Pres. & Dev., 307 Fed. Appx 596, 599 (2009). Accordingly, the plaintiff defeats summary judgment when her prima facie case, coupled with evidence that the employer's justification is false or erroneous, supports the inference that the adverse employment action was discriminatory. Reeves, 530 U.S. at 148.

---

[2] A "mixed motives" analysis is also available in ADA claims. Parker v. Columbia Pictures Industries, 204 F.3d 326, 337 (2d Cir. 2000) (applying the mixed-motive causation standard articulated in the Civil Rights Act of 1991 to claims of discrimination under the ADA).  The Second Circuit has not foreclosed the mixed motives framework under the ADA after the Supreme Court's decision in Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343 (2009). See Perry v. NYSARC, Inc., 424 F. App'x 23, 25-26 (2d Cir. 2011); Bolmer v. Oliveira, 594 F.3d 134, 148-49 (2d Cir. 2010).

"Unless the defendants' proffered nondiscriminatory reason is 'dispositive and forecloses any issue of material fact', summary judgment is inappropriate." <u>Shain v. Ctr. for Jewish History, Inc.</u>, 418 F. Supp. 2d 360, 366 (S.D.N.Y. 2005) (quoting <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 135 (2d Cir. 2000)).  Therefore, on a motion for summary judgment, "plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse employment action] is false *and* as to whether it is more likely [than not] that a discriminatory reason motivated the employer to make the adverse employment decision." <u>Gallo</u>, 22 F.3d at 1225.  The Court further warned to be "cautious about granting summary judgment to an employer when, as here, its intent is at issue."  <u>Id.</u> "[T]he <u>McDonnell Douglas</u> analysis is neither "rigid" nor "mechanized" and that the primary focus is always whether an employer treats an employee less favorably than other employees for an impermissible reason."  <u>Montana v. First Fed. Sav. & Loan Ass'n of Rochester</u>, 869 F.2d 100, 104 (2d Cir. 1989).

## IV.   ARGUMENT

### A. Plaintiff Can Establish Prima Facie Cases of Disability Discrimination, Gender Discrimination, Martial Status Discrimination and/or Retaliation

#### 1.   Disability Discrimination under the ADA & CFEPA

##### a. Plaintiff Had a Disability as Defined by the ADA as Amended

In order to present a prima facie case under the ADA, the plaintiff must show: "(1) [the] employer is subject to the ADA; (2) [the plaintiff] was disabled within the meaning of the ADA; (3) [the plaintiff] was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [the plaintiff] suffered an adverse employment action because of [her] disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). Of these factors, the defendant contends that the plaintiff cannot establish the first factor that plaintiff was disabled within the meaning of the ADAA and CFEPA. It is important to note that Congress intended a "broad scope of protection . . . afforded by the ADA" rather than a narrow definition that excludes people with limiting impairments from protection. 42 U.S.C. § 12101(a)(4). Thus, as discussed above, only minimal evidence is necessary to establish a prima facie case.

Under the ADAA, "disability" means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102. The Defendant only argues that the Plaintiff can not prove an impairment that substantially limits one or more major life activity without considering the other two definitions of a disability under the ADA, as amended. First, the plaintiff can prove her foot injury substantially limited a major life activity. The evidence reflects that the Plaintiff was restricted from transporting patients because of her injury. (Exhibit 1 p. 82-83, Exhibit 17). The ADA, as amended, provides that performing manual tasks is a major life activity

included under the statute. 42 U.S.C. § 12102(2)(A). Pushing wheelchairs and stretchers is a manual task which plaintiff was substantially limited in doing due to her disability. In addition, the ADA provides that "an impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C). Further, the ADA provides that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." U.S.C. § 12102(4)(D). The plaintiff was diagnosed with a stress fracture, sesamoiditis and/or avascular necrosis by Dr. Joseph Treadwell. (Exhibit 18).  The Plaintiff testified that she had been experiencing pain in her foot for months before actually being diagnosed in July of 2011. (Exhibit 1 p. 81). She was then restricted from manual tasks for ten weeks from July 13, 2011 until September 21, 2011. (Exhibit 6 & 7). She could not transport patients, a duty that is integral to her work duties.  This appears on the Defendant's own form. (Exhibit 17).  In point of fact her treatment for the injury was conducted by the Defendant's doctors. (Exhibits 17.)  The EEOC regulations state "that the effects of an impairment lasting or expected to last fewer than six months can be substantially limiting." Summers v. Altarum, 740 F.3d 325,332 (4th Cir. 2014), 29 C.F.R. § 1630.2(j0(1)(ix). In addition, nothing in "the regulations suggest[s] that an 'injury' cannot be an 'impairment.'' Id. Similar to the present case, In Summers v. Altarum the Court held that the Plaintiff was disabled under the ADAA because he was substantially limited in his ability to walk for seven months due to a temporary injury. Summers v. Altarum, 740 F.3d 325 (4th Cir.

2014). In the present case the Plaintiff was substantially limited from pushing or pulling patients for a period of ten weeks, over two months. Therefore, there is sufficient evidence for a jury to determine that the Plaintiff did in fact have an impairment that substantially limited a major life activity and therefore a disability as defined by the ADA, as amended.

The Plaintiff can also prove that there is a record of her impairment. The plaintiff was diagnosed with a stress fracture, sesamoiditis and/or avascular necrosis by Dr. Joseph Treadwell. (Exhibit 18). The Plaintiff notified and treated with Medworks, part of the defendant Hospital, for her disability as well. (Exhibit 17).

The plaintiff can further establish that she was "regarded as" having a disability by the defendant and its agents. A plaintiff is regarded as having an impairment if the employer perceives and treats the plaintiff as if she has an impairment, regardless of her disability status. Francis v. City of Meriden, 129 F.3d 281, 284-85 (2d Cir. 1997). **Here, Reckenwald testified that Plaintiff would have been considered disabled for the time she was on light duty. (Exhibit 2 p. 37-38).**

Therefore, there is sufficient evidence to support a finding that the Plaintiff had a disability as defined by the ADAA.

### b. Plaintiff Had a Disability as Defined by CFEPA

The definition of disability is broader under the state statute. Dzubaty v. Milford Bd. of Educ., CV065000824S, 2007 WL 2570413 (Conn. Super. Ct. Aug. 20, 2007) (citing Beason v. United Technologies Corp., 337 F.3d 271, 275 (2d Cir.2003)). CFEPA does not

include the restrictive language "substantially limits one or more major life activities."

Under the CFEPA physical disability refers to "any individual who has any chronic

physical handicap, infirmity or impairment, whether congenital or resulting from bodily

injury, organic processes or changes or from illness..." Con. Gen. Stat. § 46a-51(15).

Therefore, all that is necessary under CFEPA to be disabled is to have a physical disability,

which the plaintiff has demonstrated through her deposition testimony and medical

documents. (Exhibit 1 p. 81-83, 17, 18). The Plaintiff testified that she had been

experiencing pain in her foot for months then was restricted from manual tasks for ten

weeks from July 13, 2011 until September 21, 2011. (Exhibit 1 p. 81, 6 & 7). As such, this

evidence supports plaintiff's allegations that she is disabled within the meaning of CFEPA.

### c. Evidence Supports An Inference of Discrimination.

Defendant argues that even if Plaintiff can prove she has a disability she can not

prove that she was discriminated against, the Plaintiff disputes this.

Plaintiff testified that Al Lampety would hesitate and give Plaintiff grief about

needing transport help while Plaintiff was disabled to the point Plaintiff was afraid to fill

out an incident report or use her earned time off for her injury because she thought it would

affect her job negatively. (Exhibit 1 p. 84, 90-91, 94, 139-141, 194-196, Exhibit 15 ¶ 15).

In addition when Plaintiff would request transportation help Al would often comment,

"this is becoming a bad habit" and "Don't make a habit out of this." (Exhibit 1 p. 84, 140-

141, Exhibit 15 ¶ 15). While Plaintiff was on light duty she slipped on an IV Cap and was

required to fill out an incident report. (Exhibit 1 p. 93-94). In response to Plaintiff's slip Al commented "can't you stay off the floor." (Exhibit 1 p. 94). Al testified that he did not make any of these comments. (Exhibit 3 p. 55). Therefore, whether or not Al made these comments is a material issue in dispute and summary judgment should be denied as to the fourth and fifth counts.

Additionally, it is a discriminatory action for an employer to refuse to accommodate when an employee requests a reasonable accommodation on account of her disability. McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92, 100 (2d Cir. 2009). Plaintiff requested a reasonable accommodation of having help transporting clients. (Exhibit 1 p. 82-83). Plaintiff testified that sometimes she did not have transportation help. (Exhibit 1 p. 84, Exhibit 15 ¶ 16). Al testified that when the Plaintiff asked for assistance it was always provided. (Exhibit 3 p.48). Therefore, whether or not defendant failed to accommodate the Plaintiff is a material issue in dispute and summary judgment should be denied as the fourth and fifth counts.

Lastly, there is a causal connection between Plaintiff's disability and her termination. Plaintiff was put on light duty on July 13, 2011 and returned to full duty on September 21, 2011. (Exhibits 6& 7). Not even a month later Plaintiff was terminated on October 14, 2011. (Exhibit 1 p. 113-114, Exhibit 15 ¶ 34). Where there is "no meaningful lag time" and the adverse employment action occurs relatively close in time to the protected conduct, a causal connection can be established. Terry v. Ashcroft, 336 F.3d

128, 145 (2d Cir. 2003) (finding a causal connection where the time lapsed between the protected activity and the adverse employment action to be "slightly less than three months").

Making all reasonable inferences in the Plaintiff's favor a reasonable jury could find that she was discriminated against due to her disability and therefore summary judgment should be denied as to the fourth and fifth counts.

### 2.  Gender Discrimination

Plaintiff further claims she was discriminated against because she is a woman who has a young child. This theory of discrimination is "labeled "sex-plus" discrimination, which is discrimination based on sex plus another characteristic." Tingley-Kelley v. Trustees of University of Pennsylvania, 677 F.Supp.2d 764, 774 (E.D.Pa. 2010). The United States Supreme Court has recognized "sex-plus" discrimination in Phillips v. Martin Marietta Corp., 400 U.S. 542 (1971). "Sex – plus" discrimination is simply just a form of gender discrimination. Back v. Hastings on Hudson Union Free Sch. Dist., 365 F,2d 107, 118 (2d.Cir. 2004). A "sex-plus" claim is recognized when "not all members of a disfavored class are discriminated against." Back v. Hastings on the Hudson union Free Sch. Dist., 365 F.3d 107, 118 (2nd Cir. 2004). The question posed by sex discrimination suits is whether the employer took an adverse employment action at least in part because of an employee's sex. Chadwick v. WellPoint Inc., 561 F.3d 38, 43 (1st Cir. 2009).

In <u>Tingley-Kelley v. Trustees of University of Pennsylvania</u>, the Court, when analyzing plaintiff's gender discrimination claim, applied the same standard used when considering Title VII employment discrimination claims even though this was not an employment case. <u>Tingley-Kelley v. Trustees of University of Pennsylvania</u>, 677 F.Supp.2d 764, 775 (E.D.Pa. 2010). The Court denied summary judgment finding that the Plaintiff, "could demonstrate that Admissions Committee members discriminated against her on the basis of her gender by stereotyping her as a busy mother of young children who would have a difficult time handling both graduate school and her childcare responsibilities." <u>Id.</u> at 777. The Court found that comments regarding "'concerns about how she'll do in school especially with a family' and "it will be a tough row to hoe'" are "evidence of impermissible, sex-based stereotyping." <u>Id.</u> at 778.

In <u>Back v. Hastings on the Hudson union Free Sch. Dist.</u>, the Second Circuit held that "stereotyping of women as caregivers can by itself and without more be evidence of an impermissible, sex based motive." <u>Back v. Hastings on the Hudson union Free Sch. Dist.</u>, 365 F.3d 107, 122 (2nd Cir. 2004). The Second Circuit also held that comparative evidence of how fathers were treated was not required to survive summary judgment. <u>Id.</u> at 122.

The facts in <u>Chadwick v. WellPoint Inc.</u>, are similar to the facts in the present case. In <u>Chadwick</u>, Plaintiff alleged that she was denied a position "based on the sex-based stereotype that mothers, particularly those with young children, neglect their work duties in favor of their presumed childcare obligations." <u>Chadwick v. WellPoint Inc.</u>, 561 F.3d 38,

43 (1st Cir. 2009). See also; <u>Santiago-Ramos v. Centennial P.R. Wire-less Corp.</u>, 217 F.3d 46, 57 (1st Cir. 2000) (evidence that a direct supervisor had "specifically questioned whether [the plaintiff] would be able to manager he work and family responsibilities" supported a finding of discriminatory animus). In <u>Chadwick</u>, when Plaintiff was not given the position it was explained to her that "it was nothing you did or didn't do….you have the kids and you just have a lot on your plate right now." <u>Id</u>. at 42. "An employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities." Id. at 45.  In this case, Plaintiff asked Marie Marciano why she had not been chosen to be on the MediTech team and Marie responded; "well isn't it difficult for you, being the only one at home?" (Exhibit 1 p. 73-74, Exhibit 15 ¶ 7). Shana also told Plaintiff "I know you're a single mom. I thought that might make it harder for you." (Exhibit 1 p. 142). No one addressed plaintiff's interest of being a part of the team with her prior to making the decision that she was unable to do so in part because of her presumed childcare issues and not having a husband. (Exhibit 1 p. 76, Exhibit 15 ¶ 10). Plaintiff also made a complaint to Heidi that someone with less seniority was chosen over plaintiff. (Exhibit 1 p. 78). In addition, there was another point when new scanners were being chosen and one person per shift was supposed to go alone on site visits. (Exhibit 1. 144). Donna was also chosen to do the site visits because Heidi felt Plaintiff wasn't going to have time to go on site visits. (Exhibit 1 p. 144).

The Defendant argues that this refusal to even consider Plaintiff for the MediTech team is irrelevant because it does not constitute an adverse employment action. An employee must "experience materially adverse consequences affecting the terms, conditions, or privileges of employment." Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  In this case, Al Lamptey testified that "SuperUsers," members of the MediTech team, had more access and had more training than their peers and therefore had more privileges. (Exhibit 3 p. 56). In addition "a less distinguished title" "or other indices….. unique to a particular situation can be an adverse employment action." Galabya v. New York City Boar of Educ., 202 F.3d. 636, 640 (2d Cir. 2000).

The Defendant further argues that Plaintiff's "sex-plus" claim is really just related to child care issues which are not a covered class under federal or anti-discrimination laws. However, Plaintiff's sex-plus claim is one of gender stereotyping based on presumed childcare issues due to her gender and status as a mother, which the courts have held is a covered sex-plus claim. Plaintiff informed Heidi McLam and Al Lampety as soon as the schedule was posted, September 30, 2011, that she would not be able to work October 15, 2011 because no one was available to care for her daughter. (Exhibit 1 p. 110,111, 112 Exhibit 15 ¶ 18, Exhibit 22, Exhibit 23).  In fact Plaintiff  wrote on the sign-up sheet that she had her daughter Morghan and therefore needed coverage. (Exhibit 1 p. 110, Exhibit 8, Exhibit 15 ¶ 18, Exhibit 24 ¶ 3). The court can also take judicial notice of the findings of fact made during the Unemployment Agency process. Houhmann v. GTECH Corp., 910

F.Supp.2d 400, 405 (D.Conn. 2012); see also <u>Golden Hill Paugussett Tribe of Indians v.</u>

<u>Rell,</u> 463 F.Supp.2d 192, 197 (D.Conn. 2006).Representatives of the Defendant testified at

the hearing under oath; they tried to portray the Plaintiff as one who violated the rules; one

who committed "willful misconduct"; one who should not get unemployment because she

"refused to work". However the Referee found that testimony was not credible. Heidi

McLam, testified at the hearing. Al Lamperty testified at the hearing. None of these

witnesses was found to be credible. (Exhibit 24 ¶ 3). Plaintiff was then told on October 12,

2011, last minute, that she had to work the October 15, 2011 shift. (Exhibit 24 ¶ 4).

Plaintiff,was terminated on October 14, 2011 because she could not work the October 15,

2011 shift. (Exhibit 24 ¶ 11).  "[W]hen a state agency 'acting in a judicial

capacity...resolves disputed issues of fact properly before it which the parties have an

adequate opportunity to litigate'.....federal courts must give the agency's fact finding the

same preclusive effect to which it would be entitled in the State's courts." <u>Houhmann v.</u>

<u>GTECH Corp.,</u> 910 F.Supp.2d 400, 405 (D.Conn. 2012); citing <u>Univ. of Tenn. v. Elliott,</u>

478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d (1986); see also <u>Lillis v. Apria Healthcare Inc.,</u>

2013 WL 1561491, *4 (S.D. Cal 2013) (The court took judicial notice of the California

Unemployment Insurance Appeals Board Decision). Therefore the court in considering the

summary judgment motion must find that the issues of fact raised by the Defendants in its

motion were raised in the Unemployment Agency process and that their testimony was

found not to be credible.

Making all reasonable inferences in favor of the Plaintiff a reasonable jury could find that Plaintiff was not considered for the MediTech team because of a stereotype that she would not be committed or have time because she was a women with a child to be an effective team member. In addition, drawing all inferences in favor of the Plaintiff a reasonable jury could find that the Defendant sought to terminate the Plaintiff by insisting she must work a shift they knew, well in advance, she was not available for.

Therefore, summary judgment should be denied as to the first and second counts.

### 3. Marital Status Discrimination

The CFEPA prohibits discrimination because of an individual's marital status. C.G.S. § 46a-60(a)(2). CFEPA claims are evaluated using the same framework as Title VII claims. See Brittell v. Dep't of Corr., 247 Conn. 148, 164, 717 A2d 1254 (1998). To allege a prima facie case of discrimination, plaintiff must show: "1) that she belonged to a protected class; 2) that she was qualified for the position she held; 3) that she suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (internal citations omitted).

In the present case there is no dispute that Plaintiff was a single unmarried mother at the time of her termination and therefore a member of a protected class under the CFEPA. (Exhibit 15 ¶ 5). The Defendant, was aware that Plaintiff was not married. (Exhibit 1 p. 73-74, Exhibit 15 ¶ 7, Exhibit 19). It should be noted, Plaintiff was married

when she was hired by the Defendant in 2002. (Exhibit 15 ¶ 5, Exhibit 16). In addition,

there is no dispute that the Plaintiff was qualified for her job, she held the same position

for over nine years. Further, there is no dispute that Plaintiff suffered an adverse

employment action when she was terminated on October 15, 2011.

It is disputed whether Plaintiff not being chosen for the MediTech team constitutes an

adverse employment action. Being on the MediTech team was a plus for her position

status. It meant she could be a "superuser". (Exhibit 15 ¶ 9). This would allow her to be

promoted in the future; have more skills; allow her to advance. In this case, Plaintiff asked

Marie Marciano why she had not been chosen to be on the MediTech team and Marie

responded; "well isn't it difficult for you, being the only one at home?" plaintiff responded

"so it makes it –because someone with less seniority would get it, just because she has a

husband at home?" and Marie responded "Well, you have to admit it makes it a lot easier."

(Exhibit 1 p. 73-74, Exhibit 15 ¶ 7). Shana also told Plaintiff "I know you're a single mom.

I thought that might make it harder for you." (Exhibit 1 p. 142). Donna, who had less

sonority but who had a husband, was chosen for the position over the Plaintiff. (Exhibit 1

p. 137-138, Exhibit 15 ¶ 8). No one addressed plaintiff's interest of being a part of the

team with her prior to making the decision that she was unable to do so in part because she

did not have a husband. (Exhibit 1 p. 76, Exhibit 15 ¶ 10). In addition, there was another

point when new scanners were being chosen and one person per shift was supposed to go

along on site visits. (Exhibit 1. 144). Donna was also chosen to do the site visits because

Heidi felt Plaintiff wasn't going to have time to go on site visits. (Exhibit 1 p. 144). For the same reasons as argued above, Plaintiff argues that not being chosen for the MediTech team is an adverse employment action. Further, the statements made directly to the Plaintiff that her not having a husband is the reason she wasn't chosen for the MediTech team are evidence of circumstances giving rise to an inference of discriminatory intent and summary judgment should be denied as to Plaintiff's Marital Discrimination claim.

The Defendant focuses its argument on Plaintiff's termination and asserts that the Plaintiff can not prove her termination occurred under circumstances that give rise to an inference of discrimination, the Plaintiff disagrees. The Defendant argues Plaintiff's claim is really a claim she was treated differently because she was a woman with childcare issues which is not a protected class. However, the cases cited by Defendant are materially different then the present case. In both Guglietta and Defranco the Court's found that the Plaintiff's were requesting accommodations and material changes in their **regular shift hours** because of child care issues. (Emphasis supplied) Guglietta v. Meredith Corporation, 301 F.Supp.2d. 209 (D. Conn. 2011), Defranco v. Ametek Ameron, LLC, No. 12-670, 2013 U.S. App. LEXIS 46 08 (2d Cir. 2013). In the present case Plaintiff worked her regular shift hours, in fact Plaintiff had worked the weekend prior to October 15, 2011. (Exhibit 1 p. 189, Exhibit 2 p. 139). Further, the Plaintiff was not requesting any accommodation to her regularly scheduled shifts she simply could not work a voluntary shift on such short notice. (Exhibit 1 p. 112, 192-193, Exhibit 15 ¶ 22, Exhibit 2 p. 64).

27

In September of 2011 due to a co-worker leaving there were additional shifts that
needed to be filled. (Exhibit 1 p. 97-98, Exhibit 3 P. 17-18). On September 15, 2011 Heidi
sent an email to Plaintiff and the other CT Techs stating that the shifts would be available
for volunteers but if no one volunteered they would be assigned on a rotating basis.
(Exhibit 5). Plaintiff informed Heidi and Al as soon as the schedule was posted, September
30, 2011, that she would not be able to work October 15, 2011. (Exhibit 1 p. 110, 111, 113,
134, Exhibit 15 ¶ 18). Plaintiff asked other co-workers if they could cover her October 15,
2011 shift, including Jayne. (Exhibit 1 p. 113). Plaintiff also wrote on the sign up sheet that
she had her daughter Morghan and therefore needed coverage. (Exhibit 1 p. 110, Exhibit 8,
Exhibit 15 ¶ 18). Plaintiff had worked the weekend prior as part of her normal schedule,
the October 15th shift was a shift assigned to Plaintiff due to the co-worker leaving the
department and no one volunteering for the shift. (Exhibit 15 ¶ 33, Exhibit 2 p. 139).
Plaintiff was told by Al that Donna was going to cover the shift on October 15, 2011.
(Exhibit 1 p. 110, 112, Exhibit 15 ¶ 19). Al Lampety signed off that it was ok for Plaintiff
to switch and pick up a different date in November since she could not work October 15,
2011. (Exhibit 1 p. 134-135, Exhibit 14, Exhibit 15 ¶ 21). Plaintiff was then told on
October 13, 2011 around 3:30-4:00 p.m. that Donna could no longer work the shift on the
15th and therefore, Plaintiff had to work it or find coverage in less than 2 days. (Exhibit 1 p.
112, 192-193, Exhibit 15 ¶ 22). Al Lamptey knew prior to October 13, 2011 that plaintiff
could not work the October 15, 2011 shift because plaintiff was not married, had her

Daughter under her care that weekend and had no one to baby-sit. (Exhibit 15 ¶ 23).

Plaintiff offered to try and work part of the shift but was told by Heidi that was not good

enough she needed to work the whole shift. (Exhibit 1 p. 119, 124, Exhibit 15 ¶ 25, 29).

Other individuals had been allowed to work partial shifts in the past. (Exhibit 15 ¶ 26). On

October 14, 2011 Plaintiff was called into HR to meet with Jeanine Reckdenwald and Al

Lamptey. (Exhibit 1 p. 123, Exhibit 15 ¶ 27). In the October 14, 2011 meeting Plaintiff

informed Jeanine Reckdenwald and Al Lamptey that she had offered to work part of the

shift but Heidi McLam said that was not good enough. (Exhibit 1 p. 124, Exhibit 15 ¶ 29).

In the October 14, 2011 meeting Plaintiff was asked "Isn't there anybody that can help

you? Don't you have somebody else at home." (Exhibit 1 p. 124, Exhibit 15 ¶ 30).

Plaintiff responded that no, she is a single parent; Al's reply was "Everybody has a story."

(Exhibit 1 p. 123,126, Exhibit 15 ¶ 31).  No one told Plaintiff that part of the October 15,

2011 shift was covered and that she only needed to cover a few hours. (Exhibit 1 p. 125,

148, Exhibit 15¶ 32). On October 14, 2011, the day after Plaintiff was told the shift was

once again her responsibility, Plaintiff was fired for being unable to work the shift.

(Exhibit 15 ¶ 34).  Despite the fact that Donna had volunteered for the shift and then

backed out last minute without finding coverage she was not disciplined and is still

employed by the Defendant. (Exhibit 2 p. 150-151). Donna is married.(Exhibit 1 p. 137,

Exhibit 15 ¶ 8). Whether Plaintiff informed Al Lampety and Heidi of her inability to work

well in advance is a material issue in dispute as Al Lampety claims he did not become

aware until a few days before the shift. (Exhibit 3 p. 15).  In addition, whether Al Lampety informed Plaintiff that Donna had volunteered to cover the shift and then backed out is a material issue in dispute as the Defendants allege this never happened. (Exhibit 3 p. 31, 74-75). Therefore, summary judgment should be denied because material issues of fact exist.

Defendant argues that a Michelle Gore, one of plaintiff's co-workers also scheduled to work the weekend of the 15th, crossed her name off of her shift for the weekend of October 15, 2011 without ever having coverage. (Exhibit 1 p. 116). Gore was terminated on October 14, 2011 for refusing to work the shift. (Exhibit 1 p. 129-130). Plaintiff and Gore were not the same situation; Plaintiff's shift had already been covered by Donna. (Exhibit 3 p. 77). The Gore issue is not part of this case and the plaintiff is not in the same class.  Disparate treatment focuses on bias against an individual, the evidence of how another individual in the same group was treated must be treated with skepticism, as equitable treatment of some unmarried/disabled employees does not immunize a defendant from liability for discriminating against another unmarried/disabled employee. Bias may not follow a consistent pattern. Connecticut v. Teal, 457 U.S. 440, 454-56 (1982). "A comparator's circumstances need only be substantially similar to those of the complainant 'in all relevant aspects' concerning the adverse employment decision. The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situation." Trustees of Health and Hosp. of City of Boston,

Inc. v.  Mass. Comm'n Against Discrimination, 449 Mass. 675, 682-83 (2007); quoting

Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989).

  Further, the court must take into consideration that the Defendant had a written

discipline policy in place at the time of Plaintiff's termination, which Defendant did not

follow. (Exhibit 9). The Defendant's discipline policy provides "for those violations that

warrant this corrective approach to disciplinary action, the following system of warnings

and penalties is to be utilized." (Exhibit 9 p.1). The policy then provides for a progressive

disciplinary procedure starting with a verbal counseling, written warning, suspension and

then discharge. (Exhibit 9 p. 1-2). There is no dispute that the Defendant did not follow

this procedure in Plaintiff's case. Plaintiff had no prior written warnings or disciplinary

action. (Exhibit 2 p. 42, 53-54, Exhibit 3 p. 12, Exhibit 15 ¶ 2). In fact Al Lamptey admits

that there was no disciplinary action prior to HR getting involved and the only action that

followed was termination. (Exhibit 3 p. 12). In addition, Reckdenwald also admitted that

"Dusti never refused work in the past. She was never insubordinate in the past. Dusti was

never given any warnings at the job." (Exhibit 19). "It has been established that 'departure

from procedural regularity…can raise a question as to the good faith of the process where

the departure may reasonably affect the decision." Matthews v. Connecticut Light and

Power Co., 2006 WL 2506957, *10 (D.Conn); citing Stern v. Trustees of Columbia

University, 131 F.3d 305, 313 (2d Cir. 1997). In the present case Plaintiff was not given a

verbal warning, written warning or suspension prior to being termination. In addition,

Donna who had volunteered for the shift and then backed out did not get disciplined at all and still works for the Defendant. (Exhibit 2 p. 150-151).

Further, Defendant's Attendance policy provides that an employee is to inform their "supervisor on a timely basis if he/she cannot report to work as scheduled." (Exhibit 20 p. 2). Plaintiff did notify Al Lampety and Heidi weeks prior to the October 15, 2011 shift pursuant to Defendant's policies. (Exhibit 1 p. 110, 111, 113, 134, Exhibit 15 ¶ 18). The attendance policy further states "Failure to do so within one hour of the prescribed time required for timely notification will be considered a no call/no show." (Exhibit 20 p. 2). Therefore, even if the Defendant felt Plaintiff did not give adequate notice of her inability to work it should have been considered a no call/ no show. The attendance policy provides a procedure for employees who no call/no show and provides that after a third consecutive no call/no show it will be considered a voluntary termination. (Exhibit 20 p.3). The Defendant does not make the argument that the Plaintiff was a no call/ no show for three consecutive shifts. However, on October 14, 2011 Reckdenwald asked Plaintiff if her inability to work the October 15, 2011 meant she quit and told Plaintiff that she fired herself. (Exhibit 1 p. 123-124). Therefore, while Plaintiff did follow defendant's attendance policy the defendant did not.

Lastly, it is undisputed that Plaintiff was replaced by an individual who is married. (Exhibit 4 – Interrogatory #13).

Making all reasonable inferences in favor of the Plaintiff a reasonable jury could find that Plaintiff was treated differently because of her marital status and summary judgment should be denied as to the third count.

### 4. Retaliation

The <u>McDonnell Douglas</u> burden-shifting framework for Title VII discrimination claims also applies to plaintiff's retaliation claims for complaints of violations of Title VII, the CFEPA and the ADA. <u>Terry v. Ashcroft</u>, 336 F.3d 128, 141 (2d Cir. 2003) (internal citation omitted); <u>Weixel v. Bd. Of Educ. Of the City of N.Y.</u>, 287 F.3d 138, 148-49 (2d Cir. 2002); <u>Byra-Grzegorczyk v. Bristol-Myers Squibb Co.</u>, 572 F. Supp. 2d 233, 248 (D. Conn. 2008). "To establish a *prima facie* case of retaliation, an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" <u>Terry v. Ashcroft</u>, 336 F.3d at 141 (internal citation omitted). "'Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by' the adverse employment action or by evidence of disparate treatment of fellow similarly situated employees, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'" <u>Blanco v. Brogan</u>, 620 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2009) (citing <u>Davis v. State Univ. of New York</u>, 802

F.2d 638, 642 (2d Cir.1986); <u>DeCintio v. Westchester County Med. Center</u>, 821 F.2d 111, 115 (2d Cir.1987)).

      The Defendant firsts argues that there is no evidence that Plaintiff complained to anyone about alleged discrimination, this is in dispute. Plaintiff testified that in April of 2011 she spoke with Jonathan Rhume in HR about not being chosen for Meditech because she does not have a husband at home. (Exhibit 1 p. 156, 182-183, Exhibit 15 ¶ 13). Further, Plaintiff testified that she complained to Marie, Shana and Heidi about not being chosen for Meditech. (Exhibit 1 p. 73-74, 78, 142, Exhibit 15 ¶ 7). Plaintiff also testified that she complained about needing a transporter for her disability. (Exhibit 1 p. 182). In addition, Plaintiff testified that she went to HR on October 13, 2011 regarding Al Lampety telling her she had to work this last minute shift even though Donna had previously volunteered for the shift. (Exhibit 1 p. 116). Further, on October 14, 2011, Plaintiff complaint to Al Lampety and Reckdenwald that she had offered to work part of the October 15, 2011 shift but Heidi told her that was not good enough despite others being allowed to work part of shifts in the past. (Exhibit 1 p. 124, Exhibit 15 ¶ 26, 29).

      The plaintiff can establish a causal connection. Where there is "no meaningful lag time" and the adverse employment action occurs relatively close in time to the protected conduct, a causal connection can be established. <u>Terry v. Ashcroft</u>, 336 F.3d 128, 145 (2d Cir. 2003) (finding a causal connection where the time lapsed between the protected activity and the adverse employment action to be "slightly less than three months"). The

plaintiff complained to HR in April of 2011, sometime between July 2011 and September 2011, and again on October 13, 2011 and was terminated on October 14, 2011.

The Defendant next argues that there is no evidence that the decision maker, Reckdenwald was aware of such complaints. However, as pointed out previously the most recent complaint was made directly to Reckdenwald and she made the decision to terminate based on input from Al, Marie and Heidi. (Exhibit 2 p. 46-47, 77, 125).

Making all reasonable inferences in favor of the Plaintiff a reasonable jury could find that Plaintiff was retaliated against because of her complaints of disability, gender and marital status discrimination. Therefore, summary judgment should be denied as to the sixth and seventh count.

**B.  Defendant's proffered reason for the adverse employment actions were pretext.**

The Defendant has provided an alleged non-discriminatory reason for Plaintiff not being chosen for the Meditech team and for her termination. The Plaintiff asserts that these reasons are a pretext to mask an unlawful discrimination.

"[T]he plaintiff is not required to show that the employer's proffered reasons . . . played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.'" Back v. Hastings On Hudson Union Free School Dist., 365 F.3d 107, 123 (2d Cir. 2004). Accordingly, the plaintiff defeats summary judgment when her prima facie case, coupled

with evidence that the employer's justification is false or erroneous, supports the inference that the adverse employment action was discriminatory.  Reeves v. Sansderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

The Defendant first argues that not placing plaintiff on the Meditech team is not connected to Plaintiff's discharge. However, Reckdenwald testified that she relied on input from Marie when making the determination to terminate Plaintiff. (Exhibit 2 p. 77). As discussed above Marie made comments about Plaintiff not being chosen because she didn't have a husband at home, similar comments about not having anyone else at home were made to the Plaintiff at the time of her termination. (Exhibit 1 p. 73-74, 124, Exhibit 15 ¶ 7, 30). The Defendant next argues that Donna was chosen because she works in x-ray and CAT Scan; however, there is no dispute that Plaintiff had more seniority. (Exhibit 1 p. 78, Exhibit 15 ¶ 8). Further, defendant argues Plaintiff was a SuperUser and was asked to be a SuperUser but that is a material fact in dispute. ((Exhibit 1 p. 76, Exhibit 15 ¶ 9, 10). The defendant argues again that this was not an adverse employment action and that is addressed above. The Plaintiff asserts that a reasonable jury could find the Plaintiff was not chosen to be on the MediTech team because of "sex-plus" discrimination due to her being a women and the Defendant's presumption she would not have time for it because she has a child. The Plaintiff further asserts that a reasonably jury could find the Plaintiff was not chosen for the MediTech team because of her marital status. Further, Marie, one of the individuals that made discriminatory comments to the Plaintiff on a "sex-plus" basis and

marital status basis gave input regarding the ultimate decision to termination. (Exhibit 2 p. 77).

The Defendant's non-discriminatory reason for terminating the Plaintiff is her failure to cover or find coverage for a shift on October 15, 2011. The Plaintiff asserts that this reason is a pretext to mask an unlawful reason for terminating the Plaintiff. The Defendant argues that Gore was terminated for the same reason. However, the situations were not at all the same, Gore crossed her name off the schedule and refused to work, Plaintiff had coverage for her shift and then was told last minute she had to work. (Exhibit 1 p. 116). Reckdenwald states that Plaintiff had plenty of notice that she had to work; however, the unemployment appeal referee concluded that Plaintiff was informed only a few days prior to the shift that it was now a mandatory requirement for her to work. (Exhibit 19, Exhibit 24 ¶ 4). Lamptey admitted that Plaintiff and Gore were not the same situation. (Exhibit 3 p. 77). Therefore, whether Plaintiff was told last minute that she was required to work the October 15, 2011 shift is a material issue in dispute and summary judgment should be denied.

In addition, as addressed above Plaintiff notified her supervisor that she could not work the shift in advance pursuant to the Defendant's attendance policy which was in place at the time. (Exhibit 1 p. 110, 111, 113, 134, Exhibit 15 ¶ 18). The defendant on the other hand did not follow the policies in place regarding attendance or discipline. (Exhibit 9 & 20). "It has been established that 'departure from procedural regularity…can raise a

question as to the good faith of the process where the departure may reasonably affect the decision." <u>Matthews v. Connecticut Light and Power Co.</u>, 2006 WL 2506957, *10 (D.Conn); citing <u>Stern v. Trustees of Columbia University,</u> 131 F.3d 305, 313 (2d Cir. 1997).

Plaintiff was employed by the Defendant for over nine years and throughout that time Plaintiff often volunteered for extra shifts. (Exhibit 15 ¶ 3, Exhibit 10, Exhibit 11, Exhibit 12, Exhibit 13). Reckdenwald also admitted that "Dusti never refused work in the past." (Exhibit 19). However, Reckenwald testified she made the decision to terminate based on what she was told by Al Lamptey, Heidi McLam and Marie Marciano. (Exhibit 2 p. 46-47, 77, 125). Reckenwald testified that both Al and Heidi told her the Plaintiff never volunteered for open shifts, which is the opposite of what the Plaintiff testified to and what her personnel file reflects. (Exhibit 1 p. 127, Exhibit 15 ¶ 3, Exhibit 10, Exhibit 11, Exhibit 12, Exhibit 13). Al testified that Plaintiff would not volunteer to cover any open shifts, this is not true. (Exhibit 3 p. 85). Plaintiff did in fact volunteer for two open shifts in November, the 3rd and the 22nd. (Exhibit 1 p. 109, Exhibit 8, Exhibit 14). No other regularly employed techs are shown on the sign up sheet for October or November. (Exhibit 8). The only other names on the sign up sheet for October or November, besides the Plaintiff's, are Diane, James and Sara who are all per diems. (Exhibit 3 p. 28-29, 78, 80-82, Exhibit 8). Plaintiff's employee evaluations reflect she was considered a "team player" and often helped get the "Schedule covered when vacations or emergencies arise."

(Exhibit 10). Plaintiff "does help cover hours when needed," "Dusti takes extra shifts when she is able, to cover vacations and sick calls and she helps out when she's able with working extra shifts to help cover illness or vacation," "She helps out when her schedule allows," " (Exhibit 11, 12, 13). The evidence strongly supports that the Plaintiff had a history of picking up extra shifts and helping out and undermines Defendant's alleged non-discriminatory reason for terminating her.

Lastly, the Defendant's credibly is in issue and its alleged non-discriminatory reason for terminating the Plaintiff is not to be believed. Al Lamptey testified that the Defendant did not want to terminate Plaintiff but instead she wanted to be fired. (Exhibit 3 p. 93). In the Defendant's response to Plaintiff's CHRO complaint, Defendant stated the Plaintiff made the final decision regarding her employment and resigned her employment. (Exhibit 25 ¶ p.8 11 (d), p. 9 ¶ 13). Therefore, the Defendant's position was that Plaintiff was not terminated but instead voluntarily resigned and the Defendant challenged Plaintiff's unemployment on this basis stating she chose to be unemployed. (Exhibit 24, Exhibit 26). However, the Defendant then argues it was justified in terminating the Plaintiff because Gore was terminated for the same reason. Reckdenwald also later stated that Plaintiff was discharged. (Exhibit 19). This leads to the inference that Defendant was trying to get rid of Plaintiff by forcing her to work a shift they knew she was not available for in an effort to get her to quit. The evidence raises issues of credibility; however, "credibility issues are not appropriately resolved on summary judgment and must be

decided by a jury." <u>State v. Beavers,</u> 290 Conn. 386, 414, 963 A.2d 956 (2009). Lastly, the court must take into account that the Defendant made the same claims about the issues raised here before the Connecticut Unemployment Agency. As shown herein, the Defendant's claims were dismissed. (Exhibit 24 and 26).

Therefore, making all inferences in favor of the Plaintiff a reasonable jury could find that the termination of the Plaintiff because she was unable to work a last minute shift is pretext to mask unlawful discrimination on the basis of her disability, gender and marital status.

V.    **<u>CONCLUSION</u>**

For the foregoing reasons, genuine issues of material fact exist and as such, plaintiff's Objection to the Motion for Summary Judgment must be sustained.


THE PLAINTIFF


By <u>/s/ Vincent F. Sabatini</u>
Vincent F. Sabatini, Esquire     CT 06211
Sabatini and Associates, LLC
One Market Square
Newington, CT  06111
Tel. No.:  860-667-0839
Fax No.:  860-667-0867
e-mail:  vsabatini@sabatinilaw.com


40

**ELECTRONIC CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2014, a copy of the foregoing Motion For Extension of Time to Respond To Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Vincent F. Sabatini
Vincent F. Sabatini