```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
                                  :
DUSTI PRESTON,                    :
                                  :
     Plaintiff,                   :
                                  :
v.                                :    No. 3:12-cv-1252(RNC)
                                  :
BRISTOL HOSPITAL,                 :
                                  :
     Defendant.                   :
```

RULING AND ORDER

Plaintiff Dusti Preston brings this action against her former employer, Bristol Hospital, under Title VII, the Americans with Disabilities Act, and the Connecticut Fair Employment Practices Act, alleging that she was subjected to various adverse actions, including termination, because of discrimination on the basis of gender, disability and marital status, and retaliation for complaints of discrimination.  The defendant has moved for summary judgment.  For reasons that follow, the motion is granted.

I. BACKGROUND

The parties' Local Rule 56(a) statements show the following. Plaintiff was employed by the defendant as a "second shift" CAT Scan Technician ("CT Tech") in the Radiology Department from 2002 until her termination in October 2011.  Plaintiff's daughter, Morghan, was born in 2002.  At that time, plaintiff was married; a few years into her employment at the Hospital, she got a

divorce and remained unmarried for the remainder of her employment.

As a "second shift" employee, plaintiff typically worked on weekday evenings, plus an occasional weekend shift on a rotating basis. Two CT Techs were assigned to the second shift; at the time of the relevant events, plaintiff generally worked with Michelle Gore. Plaintiff reported directly to the "Lead Tech" for CAT Scan, Heidi McLam; McLam reported to Al Lamptey, the Operations Manager for the Radiology Department, who started in that position in May 2011. Lamptey reported to Marie Marciano, Director of Diagnostic Services.

Meditech, a software program used by Bristol Hospital to store and transfer patient records, was purchased by the Hospital in 2010, tested by employees on the "Meditech Team," and rolled out to all Hospital employees in June 2011. Plaintiff volunteered to represent her department on the Meditech Team but was passed over in favor of Donna Santopietro, a married woman with less seniority who worked in both CAT Scan and X-Ray. Plaintiff claims that when she spoke with Marciano about why she was not chosen, Marciano asked, "Well, isn't it difficult for you being the only one at home?" Plaintiff responded, "So [Donna got it] just because she has a husband at home?" Marciano replied, "Well, you have to admit it makes it a lot easier." The other

person responsible for choosing a team, Shana, allegedly told plaintiff "I know you're a single mom.  I thought that might make it harder for you."

Prior to the June 2011 launch of Meditech, each department designated "Super Users" to help others learn to use the software.  Plaintiff was asked by Lamptey to help train other CT Techs on the software and considered herself to be an informal "Super User."  McLam sent an email in May 2011 formally inviting plaintiff to be a Super User, but plaintiff denies having seen the email.  See L.R. 56(a) Statements, ¶ 47.  She believes that only those on the Meditech team were actually "Super Users," and because she was not on the Meditech team, she could not be a Super User.  See L.R. 56(a) Statements, ¶¶ 48-49, 51.

Being part of the "Meditech Team" was not a promotion or a separate position within the Hospital.  "Super Users" had more access privileges and training on the Meditech system, but received no additional pay or compensation.  Once everyone learned to use the software, the Meditech Team and Super Users were phased out.

In July 2011, plaintiff informed the Hospital that she had a temporary stress fracture in her foot.  She had been "walking around with a sore foot" since May and eventually got the injury x-rayed.  A doctor told her to wear a "boot" cast for ten weeks,

until September 21, 2011, during which time she was given a restriction of "no transporting patients" in wheelchairs or on stretchers from the emergency room to the Radiology Department, a distance of about 50 feet. Other than the "no transporting" limitation and having to wear a boot, she had no limitations, and never missed work due to her injury.

On weekdays, other staff was available to transport patients, so no special accommodation was needed. When it was plaintiff's turn to work her rotating weekend shift, she emailed Lamptey, who provided a transporter to assist her. Plaintiff claims that he did so "with a lot of hesitation" and "at times failed to arrange a transport." She also claims that Lamptey was irritated every time her need for a transporter came up, complaining, "This is becoming a bad habit." He is alleged to have stated, "Why did you have to go and get [your foot] X-Rayed for anyway," and told plaintiff she could be laid off because hiring extra transporters was too expensive. See L.R. 56(a) Statements, ¶¶ 77-81.

In September 2011, a CT Tech left the Radiology Department, causing the department to need additional weekend coverage. On September 15, McLam emailed the plaintiff and other CT Techs informing them about the procedure for filling these weekend shifts: if the shifts were not filled "within three days of the

scheduled shift" by staff volunteers, including part-time and per diem employees, the shift would be assigned using the seniority list of full-time CT Techs.  If the assigned CT Tech could not work the required shift, she was responsible for finding her own coverage.  The full-time CT Techs knew some time in advance that their assigned shift was approaching.  The record is not entirely clear with regard to how much notice was given to CT Techs.  At a minimum, however, the written schedule for the weekend of October 15 and 16, 2011, was posted on September 30, about two weeks before the shift.

In accordance with the procedure just described, plaintiff was scheduled to cover the Saturday shift of October 15, 2011.  Michelle Gore was scheduled for Sunday, October 16.  Gore had a weekend trip planned and did not want to work the shift so she crossed her name off the posted schedule.  Plaintiff wrote on the posted schedule, "I have Morghan," and informed McLam that she could not work the Saturday shift because her usual baby sitter was unavailable.

At some point, plaintiff was told that Donna Santopietro had volunteered to cover her shift.  However, Donna "backed out" on Thursday, October 13, 2011.  That day, Lamptey told plaintiff that she was responsible for finding someone to cover the shift.

In response, plaintiff and Gore visited Jeanine Reckdenwald,

Vice President of Human Resources, because neither of them had coverage for the upcoming weekend shift.  They characterized the shift as a "last minute mandatory overtime," though they had known about the schedule for a while.  Reckdenwald asked plaintiff if she could find someone to watch her daughter or arrange a playdate for "part of the shift," and encouraged plaintiff and Gore to work out the scheduling issue with Lamptey.  L.R. 56(a) Statements ¶¶ 109-11.  After leaving the meeting, plaintiff made no additional efforts to find coverage.

When plaintiff arrived for work the next day, she was directed to go to the Human Resources office.  Lamptey and Reckdenwald told her she had to work the Saturday October 15 shift.  Plaintiff was offered the use of Reckdenwald's office to arrange childcare.  Plaintiff responded that she had no one to watch her daughter, and declined the use of Reckdenwald's office.  According to Lamptey, plaintiff told Reckdenwald that Reckdenwald could fire her because she was not going to work the shift; plaintiff claims that she has "no knowledge" of this statement.  See L.R. 56(a) Statements ¶ 132.

The parties dispute whether Lamptey found coverage for part of the plaintiff's shift and whether plaintiff was informed of this.  Plaintiff claims she volunteered to work part of the shift but was told by McLam that wasn't "good enough."  L.R. 56(a)

Statements ¶¶ 122, 128. This conversation with McLam took place prior to the meeting at which plaintiff was terminated; apparently plaintiff did not reiterate her offer to work a partial shift to Reckdenwald or Lamptey.

Plaintiff claims she was effectively terminated when she declined to work the Saturday shift. Earlier that day (Friday, October 14), Gore had been fired for refusing to work the Sunday shift. Donna Santopiero, who had "backed out" of voluntarily covering plaintiff's shift, was not disciplined.

Following the termination, the Hospital denied plaintiff's application for unemployment benefits. Its decision was appealed and ultimately overturned based on a finding that plaintiff had committed no willful misconduct.

After exhausting administrative remedies, plaintiff brought this action. She claims that the Hospital's stated reason for her termination — her refusal to work an assigned shift — was a pretext for unlawful discrimination on the basis of disability, gender ("sex-plus") and marital status, and was also motivated by retaliation for prior complaints of discrimination. She also claims that she was passed over for the Meditech Team because of her status as a single mother. Finally, she claims that Lamptey failed to accommodate her foot injury and subjected her to harassment in violation of the ADA.

II. DISCUSSION

Summary judgment may be granted if the undisputed facts establish that the defendant is entitled to judgment as a matter of law.  If a reasonable jury could return a verdict for the plaintiff, a genuine dispute of material fact exists and summary judgment must be denied.  Conclusory allegations and unsubstantiated speculation, however, do not give rise to a genuine dispute of fact.  Salahuddin v. Goord , 467 F. 3d 263, 273 (2d Cir. 2006).

Discrimination claims under Title VII, the ADA and CFEPA are analyzed under the McDonnell-Douglas burden-shifting framework.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Raytheon Co. v. Hernandez, 540 U.S. 44 (2003) (applied to the ADA); Zubrow v. Solvay Pharms, Inc., 207 Fed. Appx. 37, 38 (2d Cir.2006) (applied to CFEPA).  First, the plaintiff must establish a prima facie case by showing that (1) she is a member of a protected class; (2) she was qualified for the position in question (for disability claims, a person is "qualified" if she can perform the essential functions of the job, with or without reasonable accommodation.  Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001)); (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  Shlafer v. Wackenhut

Corp., 837 F. Supp. 2d 20, 25 (D. Conn. 2011). "Discriminatory motivation may be established by allegations of preferential treatment given to similarly situated individuals, or remarks conveying discriminatory animus." Id. Plaintiff's burden at this initial step is de minimis. Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse action. Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010). Then, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the proffered reason is a pretext for discrimination. Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000). The plaintiff must adduce admissible evidence sufficient to permit a rational trier of fact to infer "that the challenged employment decision was more likely than not motivated, in whole or in part, by unlawful discrimination." Id.

Retaliation claims are subject to a similar burden-shifting analysis. To establish a prima facie case, the plaintiff must show that she engaged in protected activity, her employer knew about it, and she suffered an adverse employment action as a result. Under Title VII, if the employer points to evidence of a non-retaliatory reason for the decision, the plaintiff must show

that retaliation was the "but for" cause of the adverse action, not just a motivating factor. Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533-34 (2013). The Connecticut Supreme Court has not yet addressed whether Nassar applies under the CFEPA, but "in matters involving the interpretation of the scope of [Connecticut's] antidiscrimination statutes, [Connecticut] courts consistently have looked to federal precedent for guidance." Ware v. State, 118 Conn. App. 65, 81–82, 983 A.2d 853 (Conn. App. 2009).

"[A] trial court should exercise caution when granting summary judgment to an employer where, as here, its intent is a genuine factual issue." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). But "an employer [is] entitled to judgment as a matter of law if the record conclusively reveal[s] [a] nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [i]s abundant and uncontroverted independent evidence that no discrimination . . . occurred." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).

### Adverse Employment Action

The defendant submits that the only adverse action sufficient to establish the third prong of the prima facie case

is the termination of the plaintiff's employment.  The plaintiff responds that, in addition to the termination, the denial of the position on the Meditech Team qualifies as an adverse employment action.  [Opp. at *25.]  She also argues that Al Lamptey's comments in reference to her foot injury constituted unlawful harassment, and that the Hospital failed to accommodate her injury by failing "at times" over the ten week period of "light duty" to provide transportation help.  [Opp. at *18-19.]

An adverse employment action is a "materially adverse change" in the terms and conditions of employment.  Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).  "To be materially adverse, a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 138, 141 (2d Cir. 2003)).  Examples include failure to hire, termination, failure to promote, demotion, "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  Terry, 336 F.3d at 138; Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998).  A transfer from a prestigious position with opportunity for advancement to a less desirable position with "little opportunity for professional growth" can be an adverse action,

11

even if the positions offer the same pay and benefits.  <u>de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.</u>, 82 F.3d 16, 21 (2d Cir. 1996).  But see <u>Flynn v. New York State Div. of Parole</u>, 620 F. Supp. 2d 463, 486 (S.D.N.Y. 2009) (granting summary judgment when detriment to plaintiff's career was supported only by plaintiff's opinion that her desired position was "more prestigious" and "often a road to promotion").

Here, a jury could not reasonably conclude that the denial of a position on the Meditech Team constituted an adverse action. It is undisputed that being part of the "Meditech Team" was not a promotion or a separate position within the Hospital.  "Super Users" had more access privileges and training on the Meditech system but received no additional pay or compensation.  Plaintiff argues in her opposition papers that being on the Meditech Team was "a plus for her position status," and would allow her to be a "Super User," which in turn would "allow her to be promoted in the future; have more skills; allow her to advance."  Opp. at *26.  Plaintiff's argument is not supported by citation to evidence in the record.  Bare allegations that Meditech Team members enjoyed prestige and career opportunities do not give rise to a genuine dispute of fact precluding summary judgment.

Even assuming that being chosen as a Super User was akin to a promotion, the record shows that McLam invited the plaintiff to

be a Super User in May 2011. The plaintiff does not remember seeing that email, but her inability to recall it does not raise a genuine issue as to its authenticity. To the extent plaintiff's discrimination claims rely on denial of the Meditech or Super User positions, therefore, the motion for summary judgment must be granted.

### Failure to Accommodate

Plaintiff claims that she was denied a reasonable accommodation for her injured foot, stating that a transporter was "at times" not provided. The defendant submits that the plaintiff was not entitled to reasonable accommodation because her foot injury was not a "disability" as defined by the ADA or CFEPA. I agree.

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). Under the ADA Amendments Act (ADAAA), Pub. L. No. 110-325, 122 Stat. 3553 (Sept. 25, 2008), the terms "major life activity" and "substantially limits" are to be "construed broadly in favor of expansive coverage." 29 C.F.R. §§ 1630.2(i)(2), (j)(1)(i). Even temporary impairments lasting fewer than six months can be substantially limiting. Id. § 1630.2(j)(1)(ix); see Summers v. Altarum, 740 F.3d 325,332 (4th Cir. 2014) (temporary inability to

walk caused by injury, not long-term or permanent condition, is nonetheless a disability under the ADAAA).

CFEPA forbids discrimination against individuals who have "any chronic physical handicap, infirmity or impairment, whether congential or resulting from bodily injury, organic processes or changes or from illness."  Conn. Gen.Stat. § 46a-51(15).  CFEPA's definition of "physical disability" is thus broader than that of the ADA in that it does not require that the chronic impairment limit a major life activity.  See Beason v. United Techs. Corp., 337 F.3d 271, 277-78 (2d Cir. 2003).  The statute does not define "chronic," but courts have defined it as "marked by long duration or frequent recurrence" or "always present or encountered."  See Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 88 (D. Conn. 2006).

Plaintiff points to the temporary stress fracture in her foot as the relevant impairment, explaining that it substantially limited the major life activity of "performing manual tasks," see id., specifically, pushing wheelchairs and stretchers.  Her need for assistance in transporting patients was the only job-related restriction caused by her injury.  L.R. 56(a) Statements ¶ 63. Plaintiff has not identified any other task or life activity limited by the injury; indeed, she "had been walking around with a sore foot for a couple of months" before having the injury

14

examined by a doctor.  L.R. 56(a) Statements ¶ 60.

Pushing wheelchairs and stretchers is not a major life activity, even under the relaxed standard of the ADA as amended. Nor was plaintiff's foot injury "chronic."  Plaintiff had a "sore foot" for about two months, which healed entirely after ten weeks in a boot.  There is no evidence, medical or otherwise, that the injury is still present or likely to recur.

Even assuming plaintiff was disabled as a result of the stress fracture, the record establishes that reasonable accommodations were provided.  Transporters were already available on weekdays, and a transporter was provided to assist her on the occasional weekend when she was on call.  L.R. 56(a)(2) Statement ¶ 70.  She claims that a transporter was not provided "at times," but does not identify any "times" when no transporter was available, and admits that Lamptey provided a transporter upon request, albeit grudgingly.  L.R. 56(a)(2) Statement ¶ 70.  Accordingly, summary judgment will enter on the claim for failure to accommodate.

<u>Harassment</u>

Plaintiff argues that Lamptey's actions and comments with regard to her foot injury constituted unlawful harassment. Defendant moves for summary judgment on this claim arguing that his behavior does not support a cognizable claim.  I agree with

this argument as well.

To prove a hostile work environment claim, a plaintiff must show that the workplace is "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Lewis v. Erie Cnty. Med. Ctr. Corp., 907 F. Supp. 2d 336, 348 (W.D.N.Y. 2012); Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2012).  In considering whether a plaintiff has met this burden, courts employ a totality of the circumstances test, evaluating "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003) (quotation marks omitted).  The test has both objective and subjective components. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.").

Here, plaintiff states that Lamptey "would hesitate and give [her] grief about needing transport help to the point [she] was afraid to fill ou[t] an incident report or use her earned time

16

off for her injury because she thought it would affect her job negatively." L.R. 56(a)(2) Statement of Disputed Facts ¶ 7. Lamptey's allegedly harassing statements are as follows: When plaintiff came to work wearing the boot cast, Lamptey stated, "Why did you have to go and get it X-rayed for anyway." L.R. 56(a)(2) Statement ¶ 77. When she asked for transport help, he stated, "Don't make a habit out of this," and "This is becoming a habit." In response to her requests for help, he suggested she could be laid off because "we can't afford it." Id. ¶¶ 78, 80. Finally, when plaintiff slipped on an IV cap and fell (without any injury resulting), he stated, "Can't you stay off the floor?" Id. ¶ 79.

   Lamptey's comments do not satisfy the objective component of the hostile environment test. Though the comments are unkind, they are not sufficiently threatening, humiliating or intimidating to support a claim. Accordingly, the motion for summary judgment is granted as to the harassment claim.

     Termination

    Plaintiff's remaining claims concern her termination. In moving for summary judgment on this part of the case, the defendant argues that plaintiff cannot carry her ultimate burden of showing that its proffered reason for the termination — that she refused to work a required weekend shift and failed to find

coverage — was a pretext for unlawful discrimination or retaliation. I agree.

Plaintiff's claims of discrimination and retaliation are rendered implausible by the undisputed fact that another full-time CAT Scan Technician, Michele Gore, was terminated the same day, by the same people, for failing to find coverage for the same weekend shift. In all relevant respects, Gore was similarly situated to the plaintiff. She and Gore were both full-time CT Techs; both were scheduled to work a required overtime shift the weekend of October 15; both complained to Human Resources about the schedule at the same time; both failed to find coverage. Plaintiff attempts to distinguish herself from Gore in a number of ways: plaintiff could not find childcare, while Gore was taking a weekend trip; plaintiff offered to work a partial shift, while Gore simply refused to work; plaintiff had someone to cover for her who had backed out just days before the shift, while Gore never had coverage. Even so, both women refused to work a required shift for a legally unprotected personal reason.

Gore was not part of the alleged protected class of single mothers, nor does plaintiff claim that Gore was disabled at any point. To the extent the retaliation claim relies on plaintiff's complaint to Reckdenwald on October 13, 2011, the record indicates that Gore was also present and complained about

the schedule for a reason unrelated to childcare — her plans to leave town for the weekend — undermining any reasonable inference that the termination was in retaliation for complaints of discrimination against the plaintiff based on her status as a single mother.

In light of Gore's termination, a reasonable jury could not find that the plaintiff's termination was motivated by her status as a single mother, her foot injury, or retaliation.  Plaintiff contends that Gore's termination should be regarded as "irrelevant," and suggests that the Hospital was so determined to terminate the plaintiff on the basis of her protected status that Gore's termination was merely "collateral damage."  But without some evidence that a person outside plaintiff's protected group was permitted to miss a required shift, a jury could not reasonably find in her favor.

III.  <u>CONCLUSION</u>

Accordingly, the motion for summary judgment is hereby granted.  The Clerk may enter judgment and close the file.

So ordered this 30th day of March 2015.

_____/s/_____<br>
Robert N. Chatigny<br>
United States District Judge